IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JONATE WILLIAMS,      )
          )
    Plaintiff,      )
          )
    v.       )     Civil Action No. 1:21-cv-598 (RDA/IDD)
          )
FAIRFAX COUNTY,      )
          )
    Defendant.      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Fairfax County's ("Defendant") Motion for Summary Judgment (Dkt. 26). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motion is now ripe for disposition. Considering the Motion together with Defendant's memorandum in support of the Motion (Dkt. 27); Plaintiff Jonate Williams's ("Plaintiff") Opposition (Dkt. 30); and Defendant's Reply (Dkt. 33), it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART for the reasons that follow.

I. BACKGROUND

A. Factual Background

Although the parties dispute certain facts, the following material facts are either undisputed or considered in the light most favorable to Plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (noting that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party); *see also* Defendant's Listing of Material Facts Not Genuinely in Dispute (Dkt. 27 at 1-19); Plaintiff's Response to Defendant's Material Facts (Dkt. 30 at 7-18). Facts in dispute are so noted.

Plaintiff was hired by Fairfax County, Virginia's Department of Public Safety Communications (the "Department") in October of 2008. The Department hired Plaintiff as a public safety communicator. Dkt. 27 ¶ 1. In this role, Plaintiff worked primarily out of the department's McConnell Public Safety Transportation Operations Center. *Id.* ¶ 12. Before starting her job, Plaintiff was trained on communication skills necessary to take 911 calls and was trained on the Department's standard operating procedures. *Id.* ¶ 3. Public safety communicators like Plaintiff perform multiple tasks, but taking 911 calls is one of their primary job duties. *Id.* ¶ 4. They are also expected to gather information from the caller so that they can accurately report the kind of assistance needed; enter that data into a computer-aided dispatch system, which relays the information to a police or fire dispatcher; and give the caller instructions until help arrives. *Id.*

The Department's public safety communicators generally carry out their roles at two different types of workstations. *Id.* ¶ 5. The first variety, known as call-taking workstations, are equipped with various computer apparatuses that include several monitors, keyboards, and mice. *Id.* At these call-taking workstations, public safety communicators use available applications to address 911 calls. *Id.* The second workstation type, dispatch workstations, is where certain 911 calls that require a police or fire response are routed. *Id.* ¶¶ 7, 8. At these dispatch workstations, public safety communicators use various applications to dispatch police and fire units to the scene of incidents. *Id.* Some tasks—most notably, responding to an active police or fire event—cannot be performed from a call-taking workstation and must be performed from a dispatch work station. *Id.* ¶ 9. All computer consoles at the Department's McConnell Public Safety Transportation Operations Center are outfitted with identical standard-style keyboards and mice. *Id.* ¶ 16. During their shifts, public safety communicators regularly rotate among the skillsets in which they are

trained and are generally not permanently assigned to a single workstation. *Id.* ¶ 12. Plaintiff was trained to perform police dispatch in 2010 and fire dispatch in 2012. *Id.* ¶ 11.

The ordinary, 12.5-hour shift of a public safety communicator typically begins with a roll call meeting. *Id.* ¶ 17. Although the Department does not hold a roll call meeting each day, attendance is mandatory for those working an ordinary shift when a meeting is held. *Id.*; Dkt. 30 at 7-8; Dkt. 33 at 2-3. The Department uses roll call meetings to deliver information to public safety communicators—the day's expected public safety events, their duties, and training events. Dkt. 27 ¶ 18. After roll call, or at the start of their shift if no roll call is held, public safety commissioners arriving for their shift report to the operations floor and relieve the on-duty personnel, who must remain at their posts until they are relieved by a colleague or released by a supervisor. *Id.* ¶ 20. According to Department policy, "[r]eporting to work on time is a measurable performance element and a critical aspect of the job." *Id.* ¶ 21. Failing to report to work as scheduled without properly notifying a supervisor, and consistently arriving late for work, are grounds for disciplinary action. *Id.* ¶ 23.

The Department maintains a written policy of progressive discipline for employee misconduct. *Id.* ¶ 32. In her first ten years of employment with the Department, Plaintiff was marked as tardy on numerous occasions by different supervisors. For instance, after Plaintiff arrived late to work on February 17, 2011, Plaintiff's then-supervisor admonished her that an oral reprimand would be issued, and progressive discipline administered, if the behavior continued. *Id.* ¶ 25-26. Plaintiff attributed subsequent tardiness between 2014 and 2016 to traffic delays, home repairs, her son's medical and behavioral issues, inclement weather, other family issues, and childcare pickup and drop-off delays. *Id.* ¶¶ 27, 31, 34. On December 12, 2015, after arriving late for work several times without calling ahead, Plaintiff received an oral reprimand from her

3

supervisor, Jeffrey Davidson.  *Id.* ¶ 33.  On May 24, 2016, after arriving late to work twice that month without calling ahead, Davidson and communications operations manager Alicia Dale issued Plaintiff a written reprimand.  *Id.* ¶ 35.  The letter warned Plaintiff that further violations of Department policy regarding timely reporting to work could result in more significant disciplinary action.  *Id.*  On August 15, 2016, Davidson and Dale recommended a one-day suspension for Plaintiff after she arrived thirty minutes late to work on August 2, 2016; their proposal noted over twenty prior instances evidencing Plaintiff's unpunctuality.  *Id.* ¶ 36.  As her supervisors recommended, Plaintiff received a one-day suspension.  *Id.* ¶ 37.  Plaintiff's difficulties with tardiness resurfaced in her 2016 annual performance evaluation, which stated that Plaintiff "Does Not Meet" expectations in the performance area involving compliance with work hour and schedule requirements.  *Id.* ¶ 38.  After changing shifts in 2017, Plaintiff arrived late to work on multiple occasions in 2017, for reasons including waking up late, transporting her grandson, and traffic.  *Id.* ¶¶ 40-41.  Her new supervisor orally reprimanded her on July 5, 2018 for being late on four occasions since February of 2018.  *Id.* ¶ 42.

On the morning of January 16, 2019, Plaintiff fell in her workplace's parking lot.  She reported pain in her left knee, hands, and wrists; sought workers' compensation benefits for these injuries; and began treating with an orthopedist, Dr. Frederick Scott.  *Id.* ¶¶ 44-45.[1]  Defendant provided Plaintiff with paid injury leave, and Plaintiff remained on paid injury leave continuously until October of 2019.  *Id.* ¶ 46.  On October 8, 2019, Dr. Scott provided Williams with a note clearing her to return to work for four hours per day, three days per week.  Dr. Scott also "recommended" that Plaintiff "have a[n] ergonomics evaluation and receive a high backed chair."

---

[1] Plaintiff also claims she suffered cognitive impairments due to a brain injury caused by one or more car accidents in 2014.  Dkt. 27 ¶¶ 28-29.  The record contains no evidence that Plaintiff notified the department of these injuries until 2021.  *Id.* ¶ 30.

*Id.* ¶ 47.  Plaintiff then provided this documentation to Defendant.  *Id.* ¶ 48.  On October 9, 2019, human resources officer Archibald Cox emailed Plaintiff, stating: "Attached is the ADA accommodation request form.  Please read it and submit the completed form back to me as soon as possible. This is in regard to your request for a high-backed type of chair." Dkt. 28-5.  Plaintiff did not return the attached form at any point in 2019.  Dkt. 27 ¶ 50.  But on October 10, 2019, Plaintiff submitted additional notes from Dr. Scott specifying restrictions for her return to work. *Id.* ¶ 51.  One of these notes stated that Plaintiff was not cleared to perform chest compressions for at least one month.  *Id.*  Department assistant director Lorraine Fells-Danzer temporarily assigned Plaintiff to perform administrative duties until she was able to perform exercises that would allow her to complete her CPR certification, which by that point had lapsed.  *Id.* ¶ 52.  Plaintiff returned to call taking, but not to dispatching responsibilities, on December 13, 2019.  *Id.* ¶ 53; Dkt. 30 at 11.

On November 15, 2019, while Plaintiff was still assigned to the training division, Rick Gallanti, a vocational rehabilitation counselor working with a group called Rehabilitation Perspectives, performed an ergonomic assessment of Plaintiff's current and pre-injury workstations.  *Id.* ¶¶ 54-55.  Gallanti's assessment indicated that an ergonomic keyboard and a mouse would accommodate Plaintiff but that "modifications are limited due to the inability to swap the standard keyboard and mouse for ergonomic models."  Dkt. 28-9 at 2.  Gallanti's report mentioned other alternatives, including "to use a keyboard riser to place under the existing keyboard to incorporate a slight negative tilt for proper wrist positioning," which would be accompanied by "[a] keyboard and mouse wrist rest."  Gallanti added, "[a]nother option is a flattop keyboard wrist pad and an alternative memory foam wrist rest."  *Id.*  According to Gallanti, "[e]verything [the Department is] trying is customized to compensate for [the prohibition of] an

ergonomic keyboard and/or adjustable keyboard tray."  Dkt. 30-25 at 1.  Gallanti further recommended that Plaintiff have an appropriate chair that would enable her to use correct posture; the Department at that point provided Plaintiff with a chair.  Dkt. 27 ¶ 57.  Gallanti returned on December 19, 2019, and again on January 2, 2020, to adjust the alternative devices for Plaintiff. *Id.* ¶ 58.

On February 3, 2020, Plaintiff resumed working her pre-injury 12.5 hour shifts.  *Id.* ¶ 62. Following her return to full-duty work, Plaintiff experienced difficulty resuming her police dispatch duties.  *Id.* ¶ 63.  She also arrived late to work on several occasions after resuming her full-duty responsibilities.  On July 16, 2020, after being confronted about her repeated tardiness— five times in the preceding four months—Plaintiff received another disciplinary warning in the event she arrived late again.  Dkt. 28-17.

On Tuesday, June 2, 2020, Department director Roy Oliver e-mailed all department staff about civil rights protests slated to occur in Fairfax County that week, including the following day. *Id.* ¶ 65.  That day, another department official—James Heflin—e-mailed public safety communicators scheduled to work on June 3 and June 4, 2020, that they would be required to provide a doctor's note if they called out sick on those dates.  *Id.* ¶ 66-67.  The following day, June 3, 2020, at a roll call meeting Plaintiff objected to Heflin's requirement to provide a sick note, and told Heflin that it was insensitive of him to suggest employees would call out sick when protests against racism and inequality were occurring.  *Id.* ¶ 68.  A few months later, on September 2, 2020, the McConnell Public Safety Transportation Operations Center held a voluntary meeting to address diversity and inclusion issues.  During this meeting, Plaintiff expressed her concern that African American employees at the department were being treated differently from others and were not given the benefit of the doubt.  *Id.* ¶ 70.  She also addressed Heflin directly, telling him

that his employees should be able to tell him when they are not feeling well, and that he should not assume they are lying when they do so.  Dkt. 30 at 15.

Plaintiff arrived late to work again on September 14, 2020.  Dkt. 27 ¶ 71.  Heflin sought guidance from department officials Fells-Danzer and Damitra Gardner, who agreed that a one-day suspension would be appropriate.  *Id.* ¶ 72.  On September 24, 2020, Plaintiff received a proposed one-day suspension from supervisor Jeffrey Schaney, which identified six instances she had been tardy since March of 2020.  *Id.* ¶ 73.  On October 2, 2020, Plaintiff met with Schaney and Heflin about the proposed discipline.  *Id.* ¶ 74.  At this meeting, Plaintiff asked that her supervisors afford her a grace period for arriving to work on a timely basis.  *Id.*  Oliver, the department director, upheld her recommended one-day suspension later that month.  *Id.* ¶ 75.  Plaintiff again arrived late to work on December 12, 2020, and received a three-day suspension for that offense, which was also upheld.  *Id.* ¶¶ 76-79.

On January 18, 2021, Plaintiff submitted to her employer a completed Fairfax County-produced form seeking accommodations under the ADA, requesting a "Modified shift start time," "Extra time during training," and "Breaks as needed."  *Id.* ¶ 80.  She attributed her request to "symptoms, side effects of medications and medical treatments related to [her] Organic Brain Injury," as well as "Pain, in [her] Hands, Wrists, and forearms stemming from Work Place injury," among other causes.  *Id.*  On January 22, 2021, Plaintiff supplemented her January 18, 2021 request, adding "Ergonomic Keyboard, [and] Vertical mouse" to that request.  *Id.* ¶ 81.  On January 27, 2021, Plaintiff met with two supervisors, including Fells-Danzer and Gardner, to discuss specifics of her request.  *Id.* ¶ 84.  Over the course of the next month, Plaintiff collected and supplied responses from several different treatment providers related to her requests.  *Id.* ¶¶ 84-

85.  On February 24, 2021, Plaintiff again met with Fells-Danzer and Gardner to discuss the scope of her requests in light of the information received from her treatment providers.  *Id.* ¶ 87.

Following an exchange of written correspondence between Plaintiff and Gardner in March of 2020, on April 8, 2021, Plaintiff's employer wrote a letter to Plaintiff's orthopedist—Dr. Scott—asking whether assigning Plaintiff to a specific workstation, permanently configured with an ergonomic chair, ergonomic keyboard and vertical mouse, for her to use when performing call taking duties would enable her to perform the essential functions of her job.  *Id.* ¶ 92; Dkt. 28-36. Dr. Scott answered that it would in a reply returned on April 19, 2021.  *Id.* ¶ 93.  Having received this and other responses from Plaintiff's treatment providers, Defendant provided Plaintiff with a memorandum on May 4, 2021, outlining which ADA accommodations the department concluded were appropriate.  *Id.* ¶ 95.  Specifically, the department agreed to permanently configure a dedicated call-taking workstation for Plaintiff, outfitted with ergonomic model keyboards and mice, where she would be assigned when performing her call-taking duties.  *Id.* ¶ 96.

On June 3, 2021, the department outfitted Plaintiff's dedicated call-taking station with ergonomic keyboards and vertical mice Plaintiff had selected.  Dkt. 27 ¶ 100.  From June 3, 2021 forward, Plaintiff enjoyed exclusive use of this workspace when performing call-taking duties.  *Id.* ¶ 101.  On August 25, 2021, after arriving late to work, Plaintiff's employment with Fairfax County was terminated effective September 10, 2021.  *Id.* ¶ 102.

On May 12, 2021, Plaintiff filed a Complaint in this Court.  Dkt. 1.  Plaintiff later filed an Amended Complaint on June 30, 2021.  The Court dismissed Count II of the Amended Complaint, alleging a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, at the pleading stage.  *See* Dkt. 18.  Plaintiff brings three other causes of action in her Amended Complaint, two under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101 *et seq.*, and one under Title VII.  Count I of the Amended Complaint raises a claim for denial of reasonable accommodation under the ADA.  Count III alleges discrimination based on disability under the ADA, and Count IV alleges retaliation under Title VII.  Defendant moved for summary judgment on March 23, 2022.  Dkt. 26.  Plaintiff opposed the motion on April 6, 2022 (Dkt. 30), and Defendant replied on April 12, 2022.  Dkt. 33.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)).  "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Id.* at 615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)).  The moving party bears the "initial burden to show the absence of a material fact."  *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists."  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party.  *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists.  *Jacobs*, 780 F.3d at 570.  "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence

9

and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). And this Court requires that the non-moving party list "all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B).

III. ANALYSIS

A. ADA Failure-to-Accommodate Claim (Count I)

Plaintiff's first claim alleges Defendant failed to accommodate her disability in violation of the ADA.   To maintain a claim under the ADA for failure to provide a reasonable accommodation, a plaintiff must prove as part of her *prima facie* case that "(1) she qualifies as an 'individual with a disability' as defined in [the statute]; (2) the County had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the County refused to make any reasonable accommodation."   *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)).

Although applicable to other theories of relief under the ADA, "[t]he *McDonnell Douglas* test is inapposite in a failure-to-accommodate case because a failure-to-accommodate case does not require proof of the employer's motives."   *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1049 (10th Cir. 2017)).   If a plaintiff makes a *prima facie* showing, her employer may defeat the failure-to-accommodate claim by "demonstrating that the reasonable accommodations would impose an undue hardship." *Perdue*, 999 F.3d at 959.   The undisputed material facts in the record and the parties' briefing support a *prima facie* finding that Plaintiff qualifies as an individual with a disability under the ADA, and the Court therefore begins its analysis by assessing whether and when Defendant received notice of her disability.

1. Notice of Plaintiff's Disability

Plaintiff argues that Defendant had notice of her disability and need for a reasonable accommodation in 2019.  In support of this argument, Plaintiff points to the fact that she fell in her

workplace's parking lot on January 16, 2019, injuring her left knee, hands, and wrists.  Dkt. 27 ¶¶ 44-45.  Following this incident, Plaintiff remained on paid leave through October of 2019.  *Id.* ¶ 46.  On October 8, 2019, Plaintiff's orthopedist, Dr. Frederick Scott, provided her a note clearing Plaintiff to work four hours per day.  Dkt. 28-4.  Dr. Scott also recommended that Plaintiff have an ergonomics evaluation and receive a high-backed chair.  *Id.*  Plaintiff gave this note to her employer the following day, *see* Dkt. 28-5, and according to Plaintiff, Defendant's receipt of the note means that her employer had notice of her request for a reasonable accommodation no later than October 9, 2019.

Resisting this premise, Defendant emphasizes that when Plaintiff provided the doctor's note, department official Archibald Cox in turn provided Plaintiff with an ADA accommodation request form and told Plaintiff she should make a separate request for any accommodations.  Dkt. 27 ¶ 48.  According to Defendant, the department was relying on Plaintiff to let her employer know if she needed an ergonomic assessment or ergonomic devices due to a disability.  *Id.* ¶ 49.  Plaintiff did not submit an ADA request form at that time.  She later submitted such a form in 2021.

Viewing the facts in the light most favorable to Plaintiff, the non-moving party, the Court finds that a genuine issue of material fact exists regarding when Defendant had notice of Plaintiff's request for reasonable accommodations.  Several facts in evidence dictate this conclusion.  The record shows that on October 9, 2019, after receiving Plaintiff's doctor's note, Archibald Cox responded to Plaintiff with an email stating: "We need a note from your physician clearing you to perform chest compressions."  Dkt. 28-5.  In an e-mail dated October 10, 2019, Dr. Scott "certif[ied] that [Plaintiff] . . . is not cleared for chest compressions for at least the next 1 month."  Dkt. 28-6.  And, without necessarily indicating whether the request was sufficiently supported or would be deemed reasonable, Cox seemed to acknowledge in his email response to Plaintiff that

she was making a request for an accommodation under the ADA.  "The ADA request you are making for a specific type of chair will need recommendations from your physician on what chair(s) will meet your medical needs," Cox replied.  *Id.*

When communicating with colleagues within the department, Cox recognized Plaintiff's request in similar fashion.  An internal email dated October 8, 2019 shows that Cox stated, "[t]he high-backed chair and ergonomics evaluation should be handled as an ADA request so I will let [Plaintiff] know and provide the ADA paperwork."  Dkt. 30-27.  This acknowledgment, paired with Cox's reference to "the ADA request you are making" in his email correspondence with Plaintiff, suggests that a genuine issue of material fact exists as to whether Defendant was on notice of Plaintiff's request for a reasonable accommodation due to her disability in October of 2019.

Subsequent events further make clear that there is a genuine dispute of material fact regarding when Defendant was on notice of Plaintiff's request for reasonable accommodations under the ADA.  On November 15, 2019, Rick Gallanti, a vocational rehabilitation counselor, performed an ergonomic assessment at Plaintiff's workplace.  Dkt. 27 ¶ 54-55.  Gallanti visited Plaintiff's work stations and suggested that she could benefit from an ergonomic keyboard.  *Id.* ¶ 56.  Upon being informed by Defendant that multiple employees used the keyboard at Plaintiff's work station, he alternatively recommended Plaintiff be provided with rest pads, a riser, wrist cushions, and an appropriate chair.  *Id.*  Defendant then provided an appropriate chair for Plaintiff's call-taking station.  *Id.* ¶ 57.  On November 25, 2019, Defendant's third-party contractor, Rehabilitation Perspectives, recommended that the department provide Plaintiff with an ergonomic keyboard and an ergonomic/vertical mouse to minimize pain to Plaintiff's hands.  Dkt. 30 at 11.  The record shows that Rehabilitation Perspectives conveyed this recommendation to department supervisor Fells-Danzer.  On November 26, 2019, Dr. Scott wrote a second note.  In

13

this note, he requested that Defendant "implement all ergonomics recommendations" before Plaintiff returned to light-duty work.  Dkt. 30 at 11.  Here again, the record reflects that Fells-Danzer received this doctor's note.

More than a year later, on January 18, 2021, Plaintiff submitted a form to her employer requesting a modified shift start time, extra time during training, and breaks as needed, all due to symptoms "related to [her] disability."  Dkt. 27 ¶ 80.  On January 22, 2021, Plaintiff provided a second form, adding "Ergonomic Keyboard and vertical mouse" to her request.  *Id.* ¶ 81.  Plaintiff and department officials met the following week on January 27, 2021, and again on February 24, 2021, to discuss Plaintiff's requests.  *See id.* ¶¶ 83, 87.  Ultimately, on June 3, 2021, Defendant provided Plaintiff with a dedicated call-taking station outfitted with ergonomic keyboards and more than one vertical mouse.  *See id.* ¶ 100.

When a qualified individual requests an accommodation for a disability, the ADA imposes on her employer a "duty to engage in an interactive process to identify a reasonable accommodation."  *Wilson*, 717 F.3d at 346.  Under the ADA, "a formal accommodation request is not required to start the clock on calculating what constitutes an undue delay in granting an accommodation."  *Farquhar v. Esper*, No. 1:18-cv-724, 2018 WL 11218648, at *6 (E.D. Va. Oct. 16, 2018) (citing *Thompson v. Rice*, 422 F. Supp. 2d 158, 176 (D.D.C. 2006)) ("The request for accommodation does not have to be formal, and the words 'reasonable accommodation' do not have to be used, but the employer must be alerted to the condition and the need for accommodation.").

The Court next turns to whether Defendant's purported delay in providing Plaintiff with her requested reasonable accommodations is actionable under the ADA.  "While the United States Court of Appeals for the Fourth Circuit has not yet addressed the issue, other courts appear to

14

unanimously agree that an unreasonable delay in providing an accommodation may violate the Rehabilitation Act or the ADA." *Davis v. Wilkie*, No. CV 3:18-2385-MGL-PJG, 2020 WL 7647455, at \*4 (D.S.C. Oct. 8, 2020), *report and recommendation adopted*, No. CV 3:18-2385-MGL-PJG, 2020 WL 7396044 (D.S.C. Dec. 17, 2020).[2]  In the context of the closely analogous Rehabilitation Act, this Court has determined that certain undue delays in providing a reasonable accommodation may violate the statute. *See Farquhar*, 2018 WL 11218648, at \*6 ("Temporary denial of a reasonable accommodation can violate the Rehabilitation Act just as much as permanent denial can."). *See Crump v. TCoombs & Assocs., LLC*, No. 2:13-cv-707, 2014 WL 4748520, at \*8 (E.D. Va. Sept. 23, 2014) (observing that "despite Plaintiff's 'repeated requests' for accommodation . . . the Navy's 'failure to engage' in the interactive process resulted in the failure to identify an appropriate accommodation for [Plaintiff].") (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011)).

To determine whether a delay in providing reasonable accommodations under the ADA was unreasonable, "courts consider the totality of the circumstances, including factors such as whether the employer acted in good faith, the length of the delay, the reasons for the delay, the

---

[2] This proposition finds broad support across multiple statutory contexts involving requests for a reasonable accommodation on account of disability. *See, e.g.*, *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) ("[T]here are certainly circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable under the ADA.") (internal quotation marks and citation omitted)); *Ashcroft v. N.Y. State Dep't of Corr. & Cmty. Supervision*, --- F. Supp. 3d ---, No. 1:18-cv-00603 EAW, 2021 WL 5935107, at \*5 (W.D.N.Y. Dec. 16, 2021) ("In a reasonable accommodation case, '[a] delay in providing a reasonable accommodation can . . . violate the ADA[.]'" (quoting *Wenc v. New London Bd. of Educ.*, No. 3:14-cv-0840, 2016 WL 4410061, at \*12 (D. Conn. Aug. 16, 2016)); *cf. Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1286 (11th Cir. 2014) (holding, in request for reasonable accommodation under Fair Housing Amendments Act of 1988, that "failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, as an indeterminate delay has the same effect as an outright denial.") (quoting *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000)).

nature of the disability and accommodation, and whether the employer provided interim or alternative accommodations." *Davis*, 2020 WL 7647455, at *4.

Because a reasonable factfinder could find that Defendant was on notice of Plaintiff's disability-related request for reasonable accommodations in 2019, there is a factual dispute regarding the time in which Defendant provided such an accommodation. Well-settled law holds that mere allegation of an employer's unreasonable delay in providing a reasonable accommodation to a disabled employee s insufficient, standing alone, to defeat summary judgment under a failure-to-accommodate theory. *See Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019); *see also Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021). But where a genuine factual dispute exists surrounding such a delay, that question is one for the factfinder. *See Hannah P.*, 916 F.3d at 337. On the basis of the summary judgment record, this Court is unable to resolve on a factual analysis whether the apparent delay amounts to a denial of Plaintiff's requested accommodations. This second genuine issue of material fact precludes summary judgment on Plaintiff's failure-to-accommodate claim under the ADA.

To the extent Plaintiff suggests there is a separate genuine issue of material fact regarding her request for a grace period under the ADA, that particular allegation is absent from Plaintiff's Amended Complaint. *See* Dkt. 7 ¶¶ 12-17, 25-26. This Court cannot entertain this new argument that Plaintiff asserts for the first time in her opposition brief because it is axiomatic that a party may not amend a complaint through an opposition to a motion for summary judgment. *See Barclay White Shanska, Inc. v. Batelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008). For this reason, there is no genuine issue of material fact regarding Plaintiff's alleged ADA request for a grace period.

2. Whether Plaintiff Could Perform the Essential Functions of Her Job with a Reasonable Accommodation

In determining whether Plaintiff could have performed the essential duties of her job with a reasonable accommodation, the Court undertakes two inquiries.  First, the Court asks, "was the specific accommodation requested by [Plaintiff] reasonable?'"  *Jacobs*, 780 F.3d at 580.  Next, the Court asks, had Defendant granted the accommodation, "could Plaintiff have performed the essential functions of the position?"  *Anderson v. Sch. Bd. of Gloucester Cty.*, No. 3:18-cv-745, 2022 WL 732231, at *9 (E.D. Va. Mar. 10, 2022).

The record shows that Plaintiff's orthopedist stated that assigning Plaintiff to a single, dedicated workstation outfitted with an ergonomic keyboard and a vertical mouse while she is call-taking would have enabled her to perform her essential job functions.  *See* Dkt. 27 at 2.  This recommended accommodation, on its face, is reasonable, a conclusion that is buttressed by evidence in the record related to Defendant's subsequent ability to accommodate Plaintiff in a similar manner.  Specifically, the record reflects that when Defendant provided Plaintiff with these accommodations, Plaintiff was able to perform essential functions of her job—including call-taking.  *See id.*  Therefore, the Court concludes that Plaintiff has satisfied this element of her *prima facie* failure-to-accommodate case.

### 3. Defendant's Refusal to Provide a Reasonable Accommodation

Finally, the Court looks to whether Plaintiff has established that Defendant refused to make a reasonable accommodation.  As the Court recounted, the summary judgment record shows that Defendant did, in fact, provide Plaintiff with reasonable accommodations for her disability in 2021.  Therefore, the central issue raised under this element of Plaintiff's *prima facie* case is whether Defendant refused to make a reasonable accommodation in 2019—and in the subsequent months until Defendant provided Plaintiff with reasonable accommodations in 2021.  There is a genuine issue of material fact regarding whether Defendant had notice of Plaintiff's request for

17

reasonable accommodations in 2019.  As a result, the conclusion as to whether Defendant refused to provide such an accommodation is necessarily contingent on whether the factfinder concludes that Defendant actually had notice of the request in the first place.  After all, if an employer lacks sufficient notice of an employee's ADA request for a reasonable accommodation, there seems to be little basis to conclude that the employer could have refused to make such an accommodation. Based on the summary judgment record before the Court, Plaintiff has established that the question of notice is a genuine issue of material fact.  Consequently, the question of Defendant's refusal to grant an accommodation also presents a genuine issue of material fact that the jury must resolve.

The summary judgment record reveals that there are genuine issues of material fact with respect to Plaintiff's failure-to-accommodate claim under the ADA.  For these reasons, summary judgment on the failure-to-accommodate claim Plaintiff brings in Count One must be denied.

### B. ADA Discrimination (Count II)

Plaintiff also maintains she was subjected to disability discrimination in violation of the ADA.  To make out a *prima facie* case of disability discrimination, Plaintiff must show that (1) she was a qualified individual with a disability; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate expectations at the time of the adverse employment action; and (4) the circumstances of the adverse employment action raise a reasonable inference of unlawful discrimination.  *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012).

In cases such as this one, where the plaintiff proceeds with circumstantial rather than direct evidence, the *McDonnell Douglas* burden-shifting framework governs an ADA discrimination claim.  *See Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 336 (4th Cir. 2022) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Under that framework, if a plaintiff establishes a *prima facie* case of discrimination, the burden of production then shifts to the

defendant to articulate a legitimate, non-discriminatory, non-retaliatory justification for taking the employment action at issue. *Hannah P.*, 916 F.3d at 347. If the defendant meets this burden, the burden then shifts back to the plaintiff, who must demonstrate that the defendant's stated reasons are pretextual. *Id.*

### 1. Plaintiff's *Prima Facie* Case of Disability Discrimination

In determining whether Plaintiff has established a *prima facie* case of disability discrimination, the Court asks whether she was a qualified individual with a disability under the ADA. To answer this question, this Court looks to "(1) whether she could perform the essential functions of the job . . . and (2) if not, whether any reasonable accommodation by the employer would enable [her] to perform those functions." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994). Based on the summary judgment record, the Court finds that with reasonable accommodations—including an ergonomic keyboard, vertical mouse, and appropriate chair—Plaintiff could perform the essential functions of her position. Plaintiff was a qualified individual under the ADA and therefore satisfies this first element of her *prima facie* case of disability discrimination.

The parties appear not to dispute that Plaintiff can establish an adverse employment action as part of her *prima facie* case of disability discrimination. What is more, suspensions from one's job may qualify as adverse employment actions under the ADA because they "adversely affect the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004); *see also Parkinson v. Anne Arundel Med. Ctr.*, 79 F. App'x 602, 605 (4th Cir. 2003). Accordingly, the Court next turns to whether Plaintiff was meeting her employer's legitimate expectations at the time of the adverse action. *See Reynolds*, 701 F.3d at

150.  The record reveals that at the time of her suspension, clearly, Plaintiff was not meeting her employer's legitimate expectations for reporting to work on time.

The only contrary pieces of evidence Plaintiff marshals are satisfactory ratings in her annual performance reviews.  *See* Dkt. 30 at 20-21 (stating that these "ratings demonstrate that Defendant viewed her as successfully performing her duties despite her tardiness") (citing *Kunamneni v. Locke*, No. 1:09-cv-005, 2009 WL 5216858, at *9 (E.D. Va. Dec. 29, 2009)).  If a satisfactory performance review were enough to create a genuine dispute that an employee is meeting her employer's expectations, Plaintiff's argument might carry the day.  Fourth Circuit precedent, however, makes clear that an annual performance review "does not end our inquiry." *Tyndall*, 31 F.3d at 213.  Instead, *Tyndall* teaches that "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis."  *Id.*  The records shows that Plaintiff exhibited a pattern of tardiness after she returned to full duty in 2020, *see* Dkt. 28-11, blaming her failure to comply with her employer's request due to recurring traffic congestion, childcare issues, and oversleeping.  *See* Dkt. Nos. 27-1 at 256-57; 28-11 at 2-4; 28-17.  Such conduct is understandably viewed as falling short of Defendant's legitimate expectations.  For one, "[i]t is hardly controversial that attendance is an essential function of most employment positions."  *Vanyan v. Hagel*, 9 F. Supp. 3d 629, 638 (E.D. Va. 2014) (citing *Tyndall*, 31 F.3d at 213).

Furthermore, to the extent Plaintiff belatedly asserts that some of her absences or tardiness were attributable to her disability, "misconduct—even misconduct related to a disability—is not itself a disability, and an employer is free to [discipline] an employee on that basis."  *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n.3 (4th Cir. 1997).  Therefore, the fact that Plaintiff garnered satisfactory performance reviews does not mean that she met her employer's legitimate

20

expectations at the time of her termination.  The record contains evidence of informal warnings, formal discipline, and performance reviews that her punctuality needed to improve; yet even after receiving a one-day suspension in September of 2020, Plaintiff's punctuality problem persisted. And because the Court conducts this inquiry from "the perception of the decision maker," *Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F. Supp. 2d 717, 725 (E.D. Va. 2013), the Court finds that the summary judgment record does not support a finding that Plaintiff met her employer's legitimate expectations at the time of the adverse employment action.

Finally, Plaintiff must identify circumstances that give rise to a reasonable inference of discrimination.  She has failed to carry her burden on this score, and this Court discerns no evidence that would support a reasonable finding that Plaintiff suffered discrimination on the basis of her disability.

### 2. Defendants' Burden of Production

For the reasons stated above, Plaintiff has not proved a *prima facie* case of disability discrimination.  Even if Plaintiff had established her case, however, Defendant has put forward a legitimate, non-discriminatory reason for taking adverse employment action.  Plaintiff's extensive record of tardiness, as well as warnings and discipline both before and after the onset of her disability, forms a well-documented record of misconduct that supports a legitimate, non-discriminatory reason for taking adverse employment action.  Even if some of these tardies are fairly attributable to her disability, the fact alone says nothing of Defendant's non-discriminatory basis for placing her on suspension.  Defendant has therefore carried its burden under this stage of the *McDonnell Douglas* framework even if Plaintiff could make out a *prima facie* case of discrimination under the ADA.

21

### 3. Plaintiff's Burden of Persuasion

To ultimately prevail on her disability discrimination claim, Plaintiff must establish pretextual purpose in terminating her on the basis of her physical limitations or some other unlawful reason. To do this, with respect to her termination she must show "both that the reason advanced was a sham and that the true reason was an impermissible one under the law." *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995). The record contains no evidence that Defendant harbored a discriminatory motive in terminating Plaintiff, or that they implemented a hidden purpose in terminating her on the basis of her physical limitations or some other unlawful reason. Critically, the suspensions about which Plaintiff complaints were set into motion long before Plaintiff requested any reasonable accommodations. Furthermore, the record does not show that the supervisors who placed Plaintiff on suspension knew that her medications might be the reason for her frequent late arrivals. Neither has Plaintiff questioned the veracity of Defendant's stated reason for suspending her. Yet to establish pretext "in the Fourth Circuit, as elsewhere, a plaintiff must do more than demonstrate that an employer's belief is incorrect; plaintiff must present evidence reasonably calling into question the honesty of the employer's belief." *Tomasello v. Fairfax Cty.*, No. 1:15-cv-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016) (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). For these reasons, Plaintiff cannot establish pretext; summary judgment will therefore be entered against the ADA discrimination claim Plaintiff brings in Count III of her Amended Complaint.

### C. Title VII Retaliation (Count IV)

Plaintiff's Title VII retaliation claim proceeds under the same *McDonnell Douglas* framework as her ADA disability discrimination claim. *See Lamb v. Boeing*, 213 F. App'x 175, 179 (4th Cir. 2007) ("Retaliation claims function in parallel."). First, Plaintiff must make out a

*prima facie* case of retaliation, which requires her to prove that: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) the adverse action was causally connected to her protected activity.  *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019).

### 1. Plaintiff's *Prima Facie* Case of Retaliation

Defendant does not contest for purposes of summary judgment that Plaintiff engaged in a protected activity or that her suspensions constitute adverse employment actions, but Defendant does contest that such action is causally connected to her protected activity.

Turning to causation, Plaintiff must show that her disability was the "but-for" cause of her employer's decision to terminate her.  *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation.") (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013)).

Here, Plaintiff maintains that on September 2, 2020, she voiced concerns about race discrimination in a workplace meeting.  About three weeks later, on September 24, 2020, Defendant issued Plaintiff a notice of a proposed one-day suspension.  This twenty-two day period between Plaintiff's protected activity of complaining of racial discrimination and her proposed suspension is, taken alone, sufficient to create an inference of causation at the *prima facie* stage of Plaintiff's retaliation claim.  *See Jacobs*, 780 F.3d at 579.

Nevertheless, Defendant points out that the undisputed summary judgment record shows that Plaintiff arrived late to work on September 14, 2020.  *See* Dkt. 27 ¶ 71.  Relying on *Richardson v. Univ. of Md. Shore Reg'l Health, Inc.*, No. 1:21-CV-00669, 2021 WL 6064852, at *8 (D. Md. Dec. 22, 2021), Defendant argues that this instance of tardiness constitutes a "legitimate intervening event" that severs the causal chain.  *See id.* ("With respect to the causation prong of a

Title VII retaliation claim, '[t]emporal proximity between the protected activity and the adverse action is a significant factor . . . ,' [but] 'the causal connection may be severed . . . by some legitimate intervening event[.]'") (quoting *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)).  *Feldman* is a Sarbanes-Oxley Act case that applies a distinct causation standard, *see Feldman*, 752 F.3d at 348 (explaining the whistleblower claim's "contributing factor standard"), and the Court finds that its application does not resolve this Title VII retaliation case. Based on the record before it, this Court finds that Plaintiff has set forth a *prima facie* case of retaliation under Title VII.

### 2. Defendant's Burden of Production

When a plaintiff establishes a *prima facie* case of retaliation under Title VII, the burden then shifts to defendant, who must "rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions."  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir. 2004).  Here, Defendant has provided a legitimate, nonretaliatory reason for suspending Plaintiff: her repeated late arrivals to work.  The summary judgment record shows that Plaintiff was consistently tardy and that after accruing five tardies over the course of fourth months, she was cautioned on July 16, 2020, that subsequent late arrivals would result in discipline.  *See* Dkt. 28-17.  Then, on September 14, 2020, she again arrived late to work.  Shortly thereafter, Defendant followed through on its promised discipline, proposing that Plaintiff be placed on a one-day suspension.  The Court concludes that Plaintiff's recurrent tardiness, after being warned that subsequent late arrivals would be met with consequences, was a legitimate, nonretaliatory reason for suspending Plaintiff.

### 3. Plaintiff's Burden of Persuasion

After a defendant has stated a legitimate, nonretaliatory reason for taking adverse employment action, the burden shifts back to the plaintiff to show that the employer's stated reason is pretext for unlawful retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). In this case, Defendant has carried its burden of production, so the presumption created by Plaintiff's *prima facie* case dissipates and the burden shifts back to the employee to present evidence from which a reasonable juror could find that the proffered reason was a pretext for discrimination or retaliation." *Burgess v. Bowen*, 466 F. App'x 272, 277 (4th Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

The core of Plaintiff's retaliation argument is that because she raised complaints of racial discrimination at a workplace meeting on September 2, 2020, and because she was suspended just three weeks later, that temporal proximity is sufficient for a reasonable factfinder to infer that Defendant's stated reason for suspending her is merely pretext. In Plaintiff's telling, her suspension was retaliation against her for publicly expressing her concerns about discrimination in the workplace. But the causation standard Plaintiff must meet at this stage of *McDonnell Douglas* is a demanding one. Whereas mere temporal proximity might be enough to sufficiently make a *prima facie* showing of causation, "temporal proximity alone . . . cannot create a sufficient inference of pretext." *Nathan v. Takeda Pharms. Am, Inc.*, 890 F. Supp. 2d 629, 648 (E.D. Va. 2012) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)).

Under this more exacting causation standard, Plaintiff cannot establish that her suspension was pretextual retaliation. The record evidence shows that Plaintiff's employer left little doubt in July of 2020 that the next time she arrived late to work, she would be disciplined. When she was again tardy two months later, Defendant suspended her. And while it is true that Plaintiff engaged

in a protected activity in the intervening period, that fact does not transform Defendant's action into a Title VII violation.  "Employers need not suspend previously planned [actions] upon discovering that" protected activity has occurred, and "employers proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001); *see also Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (finding no causation between protected activity and adverse action where a Defendant's employer warned employee, before she filed her discrimination complaint, that her performance was subpar and she should prepare to leave the company).

In this case, the plan to discipline Plaintiff for any further tardiness had already been made formulated when she voiced concerns about racial discrimination on September 2, 2020.  When Plaintiff was subsequently late to work on September 14, 2022, Defendant elected to implement its discipline plan as intended.  Title VII did not require a contrary decision. Here, the discipline taken against Plaintiff for her constant tardiness was reasonable, progressive, measured, non-discriminatory and as a result was non-retaliatory. Accordingly, no reasonable factfinder could conclude that Defendant retaliated against Plaintiff for engaging in protected activity.  Summary judgment will therefore be granted as to Count IV of Plaintiff's Amended Complaint.

IV. CONCLUSION

For these reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 26) is GRANTED IN PART and DENIED IN PART.   Because Plaintiff's failure-to-accommodate claim theoretically presents genuine issues of material fact in the light most favorable to Plaintiff, the Motion is denied as to Count I of the Amended Complaint.  The Motion is granted as to Plaintiff's ADA discrimination and Title VII retaliation claims alleged in Counts III and IV of the Amended Complaint.

It is SO ORDERED.

Alexandria, Virginia
June 29, 2022

_____ /s/
Rossie D. Alston, Jr.
United States District Judge